**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@@bursor.com
       jgavenman@bursor.com
       ehorne@bursor.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETTYE FOSTER and DEBORAH HUNTER, individually and on behalf of all others similarly situated, <br><br>                               Plaintiffs, <br><br>    v. <br><br> FITBIT LLC, <br><br>                             Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiffs Bettye Foster and Deborah Hunter ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Fitbit LLC ("Fitbit" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit on behalf of purchasers with dark skin of Fitbit devices, typically smartwatches, that purport to measure oxygen saturation levels (collectively, "Fitness Trackers" or the "Products" enumerated below). Defendant markets and sells Fitness Trackers as capable of measuring oxygen levels in blood (the "SpO2 Claims"). In fact, Fitness Trackers are incapable of this measurement for users with dark skin, thus creating a disparity for Defendant's consumers: people with lighter skin are getting more accurate SpO2 readings, while people with darker skin are delivered greater inaccuracies and still paying the same price for the Products.

2.      Fitness Trackers are portable devices designed to be worn on the wrist that can monitor fitness information, like steps taken in the day and body composition. They can also monitor and spot potential medical conditions, track sleep, exercise, and more. Fitness Trackers are typically designed to conveniently connect to users' smartphones to relay this gathered data to a specific app. Worldwide revenue in the smartwatch industry is projected to reach $44.91 billion this year, and worldwide market volume is expected to reach $61.69 billion by 2027.[1]

3.      Blood oxygen sensors, known as SpO2 sensors or pulse oximeters, have been featured in smartwatches for years. The sensors use pulses of light to measure a user's pulse and oxygen saturation levels in blood.[2] Oxygen is vital to life, as the human body requires certain

---

[1] "Smartwatches - Worldwide," *Statista*, https://www.statista.com/outlook/dmo/digital-health/digital-fitness-well-being/digital-fitness-well-being-devices/smartwatches/worldwide (last accessed May 31, 2023).

[2] "The Best Smartwatch with SpO2 Oxygen Monitoring," *Cables and Sensors*, https://www.cablesandsensors.com/pages/whats-the-best-smartwatch-with-spo2-oxygen-monitoring (last accessed May 31, 2023).

oxygen levels to function correctly.[3]  Indeed, at the ideal oxygen level, human cells can create energy more efficiently, which is used for all bodily functions from digestion to cognitive processing.[4]  Thus, SpO2 sensors are reasonably sought after in fitness tracking technology.

4.    Defendant sells a variety of Fitness Trackers that feature the SpO2 technology.  The devices include the Fitbit Charge 4, Fitbit Charge 5, Fitbit Inspire 3, Fitbit Ionic, Fitbit Luxe, Fitbit Sense series, and Fitbit Versa series (collectively, as defined *supra* ¶ 1, the "Fitness Trackers" or "Products").[5]  Each of the Fitness Trackers purports to support SpO2 tracking technology.

5.    Contrary to Defendant's representations, Fitness Trackers are not, in fact, capable of measuring oxygen saturation for people with darker skin.

6.    As such, Defendant engaged in widespread false and deceptive advertising on its Fitness Trackers by claiming Fitness Trackers are generally capable of this measurement, without any kind of qualifier that the feature inherently discriminates against people of color (the "Sensor Claims").  Fitbit's website, fitbit.com, and any retailer selling Defendant's Fitness Trackers, including Amazon and HSN, prominently advertise the Sensor Claims on the various product pages of each Fitness Tracker.

7.    Plaintiffs and Class Members purchased defective Fitness Trackers designed, marketed, manufactured, distributed, and sold by Defendant as capable of providing SpO2 measurements.  Further, Plaintiffs and Class Members relied to their detriment on Defendant's representation that Fitness Trackers are capable of measuring oxygen saturation.  Plaintiffs and Class Members would not have paid to purchase Defendant's Fitness Trackers—or would not have paid as much as they did to purchase them—had they known that they are not, in fact, capable of providing this integral measurement for consumers with dark skin.  Plaintiffs and Class Members thus suffered monetary damages as a result of Defendant's deceptive and false representations, and omissions.

---

[3] *Id.*

[4] *Id.*

[5] "Fitbit SpO2 User Manual, Version W," *Fitbit by Google*, https://help.fitbit.com/manuals/manual_spo2_en_US.pdf (last accessed May 31, 2023).

8.      This mislabeling of the Fitness Trackers leads consumers to believe that the Products will measure SpO2 on anyone using the device when, in fact, the Products are incapable of this measurement for people with dark skin. Nevertheless, Fitness Trackers are labeled and sold as capable of such a measurement, and they command a significant price premium over other fitness trackers that do not feature this technology. Thus, Plaintiffs and Class Members have thus been hit with a costly double-whammy: a premium purchase for a worthless product.

**PARTIES**

9.      **Plaintiff Bettye Foster** is a citizen of California, residing in Oakland, California. On October 5, 2021, Plaintiff Foster purchased one of Defendant's Fitness Trackers, the Fitbit Charge 4, from Amazon.com while she was in California. Prior to her purchase of the Fitness Tracker, Plaintiff Foster reviewed the Product's advertising and saw that the Fitness Tracker was purportedly capable of SpO2 measurements. Plaintiff Foster relied on that representation to choose her Fitness Tracker over comparable products, as she has a medical condition that relies on keeping track of SpO2 measurements. Plaintiff Foster saw those representations prior to, and at the time of purchase, and understood them as representations and warranties that her Fitness Tracker was capable of SpO2 measurements. Plaintiff Foster did not know and was not made aware of the fact that this feature would not work properly with her skin color. Plaintiff Foster relied on the representations and warranties that her Fitness Tracker was capable of SpO2 measurements in deciding to purchase her Fitness Tracker. Accordingly, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Fitness Tracker on the same terms had she known those representations were not true. In making her purchase, Plaintiff Foster paid a substantial price premium due to the false and misleading Sensor Claims. However, Plaintiff Foster did not receive the benefit of her bargain because her Fitness Tracker, in fact, was not capable of SpO2 measurements. Plaintiff Foster also understood that in making the sale, her retailer was acting with the knowledge and approval of the Defendant and/or as the agent of the Defendant. Plaintiff Foster further understood that the purchase came with Defendant's representation and warranties that her Fitness Tracker could provide oxygen saturation level measurements.

10.    **Plaintiff Deborah Hunter** is a citizen of California, residing in Suisun City, California.  In or around July 2021, Plaintiff Hunter purchased one of Defendant's Fitness Trackers, the Fitbit Versa 2, from HSN.com while she was living in California.  Prior to her purchase of the Fitness Tracker, Plaintiff Hunter reviewed the Product's advertising and saw that the Fitness Tracker was purportedly capable of SpO2 measurements.  Plaintiff Hunter relied on that representation to choose her Fitness Tracker over comparable products.  Plaintiff Hunter saw those representations prior to, and at the time of purchase, and understood them as representations and warranties that her Fitness Tracker was capable of or SpO2 measurements.  Plaintiff Hunter did not know and was not made aware of the fact that this feature would not work properly with her skin color.  Plaintiff Hunter relied on the representations and warranties that her Fitness Tracker was capable of SpO2 measurements in deciding to purchase her Fitness Tracker.  Accordingly, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Fitness Tracker on the same terms had she known those representations were not true.  However, Plaintiff Hunter remains interested in purchasing a Fitness Tracker with SpO2 monitoring capabilities, and would consider Fitbit Fitness Trackers in the future if Defendant ensured that the Products would work equally well across various skin colors.  In making her purchase, Plaintiff Hunter paid a substantial price premium due to the false and misleading Sensor Claims.  However, Plaintiff Hunter did not receive the benefit of her bargain because her Fitness Tracker, in fact, was not capable of SpO2 measurements.  Plaintiff Hunter also understood that in making the sale, her retailer was acting with the knowledge and approval of the Defendant and/or as the agent of the Defendant.  Plaintiff Hunter further understood that the purchase came with Defendant's representation and warranties that her Fitness Tracker could provide oxygen saturation level measurements.

11.    **Defendant Fitbit LLC** is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in San Francisco, California.  Fitbit manufactures, sells, and/or distributes Fitbit-brand products, and is responsible for the advertising, marketing, trade dress, and packaging of Fitness Trackers.  Fitbit manufactured, marketed, and sold Fitness Trackers during the class period.  The planning and execution of the

advertising, marketing, labeling, packaging, testing, and corporate operations concerning Fitness

Trackers and the Sensor Claims was primarily carried out at Fitbit's headquarters and facilities

within California.  The policies, practices, acts, and omissions giving rise to this action were

developed in, and emanated from, Fitbit's headquarters in San Francisco, California.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as

modified by the Class Action Fairness Act of 2005 ("CAFA"), because at least one member of the

Class, as defined below, is a citizen of a different state than Defendant, there are more than 100

members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of

interests and costs.

13.     This Court has personal jurisdiction over Defendant because it conducts substantial

business within California, including the manufacturing, sale, marketing, and advertising of Fitness

Trackers.  Defendant also maintains its corporate headquarters and principal place of business in

this judicial district.  Furthermore, a substantial portion of the events giving rise to Plaintiffs'

claims occurred in this state, including Plaintiffs' purchases of Fitness Trackers.

14.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of

the events, omissions, and acts giving rise to the claims herein occurred in this District.  Also,

Defendant is headquartered in this District, and Plaintiff Bettye Foster resides in this District and

purchased Defendant's Fitness Tracker in this District.

## FACTUAL ALLEGATIONS

**A.      Background On Oxygen Saturation**

15.     Oxygen is a colorless, odorless, tasteless gas essential to living organisms.[6]  Human

bodies require a certain amount of oxygen to function properly.[7]  Oxygen enters the body through

the nose or mouth during inhalation, passes through the lungs, and ends up in the bloodstream.[8]

---

[6] "Oxygen," *Britannica*, https://www.britannica.com/science/oxygen (last accessed May 31, 2023).

[7] "Blood Oxygen Level," *Cleveland Clinic*, https://my.clevelandclinic.org/health/diagnostics/
22447-blood-oxygen-level (last accessed May 31, 2023).

[8] *Id.*

Once in the bloodstream, oxygen passes to cells throughout the body that need oxygen to create energy efficiently, which in turn allows the body to function correctly.[9]

16.    Blood oxygen saturation, or blood oxygen level, is the measurement of oxygen circulating in the bloodstream.[10]  That measurement can be taken through either a blood draw or with a pulse oximeter, the latter typically performed in hospitals in the form of a clip-on device placed on a person's finger or toe.[11]  Low blood oxygen saturation levels, or hypoxemia, can lead to serious conditions and damage to individual organ systems—most notably the brain, heart, and kidneys.[12]

17.    A blood oxygen saturation measurement shows what percentage of blood is saturated with oxygen, or the "SpO2 level."[13]  Optical SpO2 sensors use red and infrared light sensors to detect oxygen levels, sensing changes in those levels by looking at the color of your blood.[14]  The sensors are able to measure the volume of oxygen based on the way the light in the sensor passes through a person's finger and delivers data to the device's screen, which displays the percentage of oxygen in the blood.[15]

18.    In recent years, interest in blood oxygen levels increased due to the COVID-19 pandemic, as people learned that low levels could be a sign of COVID-19.[16]  The interest led to a large uptick in pulse oximeter purchases, so people could have an extra tool that may be useful in self-assessing for signs and symptoms of the illness.[17]  Indeed, COVID-19 had a positive impact on

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] "Oxygen Saturation," *National Library of Medicine*, https://www.ncbi.nlm.nih.gov/books/NBK525974/ (last accessed May 31, 2023).

[13] *See* "Blood Oxygen Level," *supra* n.7.

[14] Michael Sawh, "SpO2 and pulse ox wearables: Why wearables are tracking blood oxygen," *Wareable*, https://www.wareable.com/wearable-tech/pulse-oximeter-explained-fitbit-garmin-wearables-340 (February 18, 2022).

[15] *Id.*

[16] Adrian Pristas, M.D., "Blood Oxygen Levels: What's All the Hype About?" *Hackensack Meridian*, https://www.hackensackmeridianhealth.org/en/healthu/2020/09/28/blood-oxygen-levels-whats-all-the-hype-about (September 28, 2020).

[17] "Pulse Oximeter Market Size, Share & Trends Analysis Report By Product Type (Fingertip pulse oximeters, Handheld pulse oximeters), By Type, By Age Group, By Technology, By End-

---

the pulse oximeter market as it "significantly drove demand for remote monitoring solutions used for both hospitals and homecare settings."[18]

19.     As demand for pulse oximeters went up, so too grew the market.  Relevant to this case, the technology started to be featured in "wearable" fitness tracking technology—an already booming marketplace of its own—with major players like Apple, Garmin, Fitbit, Withings, and Huawei getting in on the action.[19]  Each company puts its own spin on the technology, but the premise is the same: a sensor in a wristwatch designed to read SpO2 levels at any time.

### 1.     How Oxygen Saturation Levels Impact The Human Body

20.     Low blood oxygen levels indicate that a person's lungs and/or circulatory system may not be working as they should.[20]  As a result, a lower-than-normal blood oxygen level is concerning.  And the lower the oxygen level, the greater likelihood for complications in body tissue and organs.[21]  Thus, SpO2 measurements are considered an important indicator of respiratory health since it signals how well the body is able to absorb oxygen.[22]

21.     Symptoms of hypoxemia can vary depending on the severity of the condition and from person to person, but most commonly include headaches, shortness of breath, fast heartbeat, coughing, wheezing, confusion, bluish color in skin, fingernails, and/or lips, and cherry color in skin, fingernails, and or/lips (a sign of carbon monoxide poisoning).[23]

22.     Low blood oxygen levels can be caused by a variety of conditions, including but not limited to heart conditions, lung conditions such as asthma, emphysema, and bronchitis, sleep apnea, inflammation or scarring of lung tissue, and being in locations at high altitude, where

---

use, By Region, And Segment Forecasts, 2023-2030," *Grand View Research*, https://www.grandviewresearch.com/industry-analysis/pulse-oximeter-market.

[18] *Id.*

[19] *See* Sawh, *supra* n.14.

[20] *See* "Blood Oxygen Level," *supra* n.7.

[21] *Id.*

[22] Lisa Eadicicco, "Smartwatches Have Measured Blood Oxygen for Years.  But Is This Useful?" *CNET*, https://www.cnet.com/tech/mobile/smartwatches-have-measured-blood-oxygen-for-years-but-is-it-useful/ (June 16, 2022).

[23] *See* "Blood Oxygen Level," *supra* n.7.

oxygen in the air is lower.[24]  Due to the critical nature of blood oxygen saturation for people with those conditions, it can be essential to be able to monitor current oxygen saturation.[25]

### 2.     Oxygen Saturation Measurements In Wearable Devices

23.     Smartwatches in today's market are purportedly able to measure everything from heart rate to sleep quality, with blood oxygen saturation measurements becoming particularly relevant over the past few years when the COVID-19 pandemic made measuring vitals from home more desirable.[26]  Smartwatches with this feature measure SpO2 levels by shining a light from the watch, through the wrist, and measuring the light reflected.[27]

24.     While SpO2 measurements are helpful to (literally) have on hand, most companies producing wearables have not received FDA clearance for their blood oxygen measuring technology, which makes it unclear how those readings should be used.[28]  A typical consumer does not understand that smartwatch SpO2 readings are often inaccurate and should not be a replacement for professional testing.  That this technology is advertised as a tool that can "help you learn when there may be an indication of important changes in your fitness and wellness," is misleading for consumers who reasonably trust that the measurements will be accurate.[29]

25.     Further, even though companies producing smartwatches featuring SpO2 technology typically note (though often in small print or hidden behind dropdown menus[30]) that the tracking capabilities are "[n]ot intended to diagnose or treat any medical condition or for any other medical purpose," they are "[i]ntended to help you manage your well-being and keep track of your information."[31]  Thus, the technology can purportedly provide an ability to keep track of health

---

[24] *Id.*

[25] *Id.*

[26] *See* Eadicicco, *supra* n.22.

[27] *Id.*

[28] Lisa Eadicicco, "Fitbit and Apple know their smartwatches aren't medical devices.  But do you?" *CNET*, https://www.cnet.com/tech/mobile/features/fitbit-apple-know-smartwatches-arent-medical-devices-but-do-you/ (January 14, 2022).

[29] "Health Metrics & SpO2," *Fitbit*, https://www.fitbit.com/global/us/technology/health-metrics.

[30] "Versa 2," *Fitbit*, https://www.fitbit.com/global/us/products/smartwatches/versa?sku= 507BKBK.

[31] *Id.*

information—despite the ever-growing body of scientific research demonstrating that this technology is not yet capable of providing SpO2 data.

26.    The reality is that companies purporting to have those features are "marketing [] device[s] with medical functions while winking and insisting they're not medical functions."[32] "Whatever the fine print might say, some people are going to treat these as medical devices — and that's a concern."[33]  The marketing reasonably leads consumers, including Plaintiffs, into believing this is data that can be trusted.  Researchers, while excited by the addition of blood-oxygen data in wearable devices, are cognizant that there is not enough information about its validity.[34]  The main takeaway on how consumers will use and interpret this technology from Duke University's Jessilyn Dunn, an assistant professor of biomedical engineering, was: "We have toys, and we have things that are used for clinical purposes.  And it really needs to be a clear distinction."[35]

27.    It should not be acceptable for giant tech companies to market devices that take readings of our bodies without disclosing how those devices were tested and what their error ranges might be.[36]  Without proper disclaimers, all consumers are left with are bright and shiny representations of what the technology can do, and are left to their own without any notice that the devices may face inaccuracies that companies like Defendant are failing to disclose.

**B.    Defendant's Misrepresentations Regarding The Fitness Trackers**

28.    Defendant prominently markets the Fitness Trackers' purported SpO2 measuring capabilities throughout its website.  For example, on the home page of Fitbit's website, www.fitbit.com, SpO2 is listed in the "Technology" tab (red box added for emphasis):[37]

---

[32] Geoffrey A. Fowler, "The new Apple Watch says my lungs may be sick.  Or perfect.  It can't decide." *The Washington Post*, https://www.washingtonpost.com/technology/2020/09/23/apple-watch-oximeter/ (September 23, 2020).

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] Homepage, *Fitbit*, https://www.fitbit.com/global/us/home (last accessed May 31, 2023).



29.     Navigating to the "Health Metrics & SpO2" page of Defendant's website brings customers to a page detailing how smartwatches "make it easy to track health metrics like SpO2… to uncover trends and changes to your well-being" (red box added for emphasis):[38]



30.     This page of Defendant's website consistently highlights the SpO2 feature ahead of other health metric technology featured on its Fitness Trackers, such as skin temperature, breathing rate, heart rate variability, and others.  The section demonstrating how users can see "health metrics

---

[38] *See* "Health Metrics & SpO2," *supra* n.29.

all in one place," the "Health Metrics dashboard," highlights the SpO2 feature first—and with only one other feature listed (red boxes added for emphasis):[39]



31.     Further down the webpage, Defendant lists technology features, again displaying Oxygen Saturation first among many (red box added for emphasis):[40]



32.     Yet another portion of the same webpage is solely dedicated to helping consumers "Understand your SpO2 levels," featuring a convenient button to bring you to product pages for Defendant's Fitness Trackers that incorporate the SpO2 technology:[41]

---

[39] *Id.*

[40] *Id.*

[41] *Id.*



33.    Consumers can then click through to the "related watches," choose a product from Defendant's provided list of applicable Fitness Trackers, and read further information on the SpO2 technology in each product's features and specifications section.

34.    By way of example, the viewing process of a Fitness Tracker is demonstrated below for the Fitbit Versa 2 smartwatch on Defendant's website, which consistently advertises the SpO2 technology as a top feature of the Product:[42]



35.    On the "Versa 2" product page, customers can scroll down the page to find a broader (but still materially limited by omission of racial bias) explanation of the SpO2 feature in

---

[42] *See* "Versa 2," *supra* n.30.

the smartwatch.  To get to this page, customers must click a pink "See all features & specs" button, which brings up a screen with drop-down menus for each of the Fitness Tracker's features:[43]



36.     When a customer clicks on "SpO2 (blood oxygen) tracking (emphasized by added red box above), the following details appear:[44]



37.     Navigating to the "Specs" portion of the page details the technology used in the SpO2 monitoring function of the smartwatch (red box added to highlight relevant portion):[45]

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

1
2
3
4
5
6
7
8
9

**Sensors & Components**
- 3-axis accelerometer
- Optical heart rate monitor
- Red and infrared sensors for oxygen saturation (SpO2) monitoring
- Altimeter
- Vibration motor
- NFC
- Ambient light sensor
- Wi-Fi antenna (802.11 b/g/n)
- Microphone
- Device temperature sensor (skin temperature variation available through Premium only)◆◆◆

10    38.    As demonstrated above, Defendant does not provide any disclaimer relevant to the

11  inaccuracies in this technology depending on skin tone.  Despite warning customers that the feature

12  is "intended to help you manage your well-being and keep track of your information," and is "[n]ot

13  intended to diagnose or treat any medical condition," Defendant is utterly silent on the racial bias

14  present in the technology.

15    39.    In short, Plaintiffs and Class members who purchased the Fitness Trackers were not

16  told that the SpO2 technology, which is a key feature of the Products (as marketed by Defendant

17  and pursued by consumers), produces less accurate results for people with darker skin.  Fitbit failed

18  to disclose anywhere that the Fitness Trackers suffer from the same technical issues pertaining to

19  race present in all pulse oximeters.  Plaintiffs and other consumers with dark skin paid a price

20  premium for a device that they believed was capable of SpO2 measurements, and received a

21  Fitness Tracker of a lower quality than did their lighter-skinned counterparts.  Had Fitbit disclosed

22  this inequality in SpO2 tracking, Plaintiffs and Class Members would have been aware of this

23  material fact and consequently would not have purchased the Fitness Trackers, or would have paid

24  less for the Fitness Trackers.

25
26
27
28

**C.      Defendant's Fitness Trackers Are Not Capable Of Measuring Oxygen Saturation Levels For People With Dark Skin**

40.      Post-pandemic data has highlighted shortcomings of the pulse oximeter technology—particularly when it comes to skin color.[46]  Indeed, "a growing body of evidence shows the device can be inaccurate when measuring oxygen levels in people with dark skin tones."[47]

41.      Pulse oximeters work by sending light through the skin and calculating a person's oxygenation by figuring out how much of the light was absorbed by the hemoglobin in the blood.[48]  This presents a key issue for people with dark skin: assuming that the only absorber of the light energy is the hemoglobin, when in reality the skin pigmentation also absorbs the light.[49]  For people with darker skin, that can result in a reading from the pulse oximeter that overestimates the amount of oxygen in the blood, thus preventing accurate readings that may point to any of the issues (*supra* ¶¶ 16, 20-22) and any subsequent necessary care.[50]

42.      Unfortunately, this disparity in critical medical technology translates over to the smartwatch industry.  The broadest swathe of research pertaining to this issue is related to the

---

[46] Craig LeMoult, "When it comes to darker skin, pulse oximeters fall short," *NPR*, https://www.npr.org/sections/health-shots/2022/07/11/1110370384/when-it-comes-to-darker-skin-pulse-oximeters-fall-short (July 11, 2022).

[47] *Id.*; *see also*: "FDA In Brief: FDA warns about limitations and accuracy of pulse oximeters," *U.S. Food & Drug Administration*, https://www.fda.gov/news-events/fda-brief/fda-brief-fda-warns-about-limitations-and-accuracy-pulse-oximeters (February 19, 2021); Daniel Zlatev, "Pulse oximeter accuracy differs by skin color, 'unreliable' to measure true oxygen saturation in all COVID-19 pneumonia cases," *Notebook Check*, https://www.notebookcheck.net/Pulse-oximeter-accuracy-differs-by-skin-color-unreliable-to-measure-true-oxygen-saturation-in-all-COVID-19-pneumonia-cases.596569.0.html (January 30, 2022); Jacqueline Howard, "FDA panel examines evidence that pulse oximeters may not work as well on dark skin," *CNN Health*, https://www.cnn.com/2022/11/01/health/pulse-oximeters-fda-meeting/index.html (November 1, 2022); Catherine Roberts, "Pulse Oximeters Don't Work as Well for People With Dark Skin. Scientists Are Racing to Fix Them." *Consumer Reports*, https://www.consumerreports.org/health/pulse-oximeters/pulse-oximeters-dont-work-as-well-for-people-with-dark-skin-a9391849239/ (May 2, 2023); Haley Bridger, "Skin Tone and Pulse Oximetry," *Harvard Medical School*, https://hms.harvard.edu/news/skin-tone-pulse-oximetry (July 14, 2022); Sheila Jacobs, "Pulse Oximetry Inaccuracy in Darker Skin Tones Is Evidenced by Mounting Research," *Pulmonology Advisor*, https://www.pulmonologyadvisor.com/home/general-pulmonology/pulse-oximetry-inaccuracy-in-darker-skin-tones-evidenced-by-mounting-research/ (October 24, 2022).

[48] *See* LeMoult, *supra* n.46.

[49] *Id.*

[50] *Id.*

---

correlation between skin tone and heart rate sensors in wearable devices.  Light sensors used to track heart rate in wearable devices do not work as well on darker skin, according to a study analyzing the effect of skin tone on the photoplethysmography (PPG) signal.[51]

43.    According to a study presented at the American College of Cardiology's 71st Annual Scientific Session, smartwatches and other wearable devices may be less accurate in people with darker skin tones.[52]  After a screening of 622 scientific papers, researchers identified 10 studies that reported heart rate and rhythm data for consumer wearable technology according to a participant's race or skin tone.[53]  Of those 10 studies, 4 found that heart rate measurements were significantly less accurate in darker-skinned individuals compared with either lighter-skinned individuals or measurements from validated devices, such as chest strap monitors or electrocardiograms.[54]  And one study reported that wearable devices recorded significantly fewer data points for people with darker skin.[55]

44.    SpO2 sensors in smartwatches work similarly to the PPG sensors used to measure heartrate.[56]  PPG—or optical heart rate—sensors work by shining a green light into the skin to determine heart rate based on the light that is reflected back.[57]  The difference is that, instead of green light, smartwatch SpO2 sensors shine red and infrared light into the skin to estimate blood oxygen levels (*i.e.*, the same technology that has demonstrable inaccuracies for people with dark skin, *see supra* ¶ 37).[58]

---

[51] Ajmal et al., "Monte Carlo analysis of optical heart rate sensors in commercial wearables: the effect of skin tone and obesity on the photoplethysmography (PPG) signal," *Biomedical optics express* vol. 12, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8713672/ (November 10, 2021).

[52] American College of Cardiology, "How accurate is smartwatch heart data?  It depends on your skin tone," *Medical Xpress*, https://medicalxpress.com/news/2022-03-accurate-smartwatch-heart-skin-tone.html (March 23, 2022).

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] Victoria Song, "How to measure your SpO2 on your smartwatch," *The Verge*, https://www.theverge.com/23031829/how-to-measure-spo2-smartwatch (April 19, 2022).

[57] *Id.*

[58] *Id.*

45.    To make matters worse, blood oxygen measurements taken from the wrist are also usually less accurate than those taken from the fingertip.[59]  While fingertip pulse oximeters shine light through the entire finger, wrist-based sensors use the less reliable method of measuring the reflection of light.[60]  Factors making the wrist a less reliable point of measurement include that blood flow is not as strong in the wrist as it is in the finger, outside light sources might be able to skew the reflected light, and the outside of the wrist does not have as many blood vessels close to the surface of the skin.[61]

46.    Fitbit's own director of research, Conor Heneghan, noted the wrist measurability issue in a Washington Post interview, stating "[i]t's a pretty hard technical problem to measure SpO2 on the wrist."[62]  And, Heneghan was forthcoming on the testing Fitbit did on its products, such as working with a lab at the University of California at San Francisco to test the device on volunteers—in which Fitbit included people of different skin tones.  Heneghan even stated that Fitbit "tried to overrepresent darker-skin-toned people in [its] testing to make sure that it's not skewed toward a particular tone."[63]  Heneghan, however, refused to disclose Fitbit's exact error rate for those studies.[64]

47.    The combination of inaccuracies faced in basic pulse oximeter technology for people with darker skin, the demonstrated inaccuracies stemming from very similar PPG heart rate sensors, and the further troubling location of the Fitness Trackers on the wrist, it is a clear leap to presume that Defendant's SpO2 measuring technology will not work to the same level of efficacy for people with darker skin when compared to those with lighter skin.  Despite this growing wave of concern over inaccuracies with SpO2 sensors in wearables, Defendant has yet to release any

---

[59] *Id.*

[60] *Id.*

[61] Nicole Wetsman, "Apps aren't a reliable way to measure blood oxygen levels," *The Verge*, https://www.theverge.com/2020/4/23/21232488/blood-oxygen-apps-iphone-samsung-unreliable-fitbit-garmin-oximeter (April 23, 2020); *see also* Nicole Wetsman, "Apple Watch's blood oxygen monitor is for 'wellness,' not medicine," *The Verge*, https://www.theverge.com/21438576/blood-oxygen-apple-watch-series-6-reliability (September 16, 2020).

[62] *See* Fowler, *supra* n.32.

[63] *Id.*

[64] *Id.*

information to the contrary or place any relevant disclaimer on its website or the Fitness Trackers packaging.

48.     Plaintiffs are not alone in feeling harmed by deceptive practices by companies like Defendant incorporating inaccurate SpO2 technology into their wearable devices.  In fact, a complaint was filed in December 2022 expressing similar concerns over Apple's deception with regard to its smartwatches.[65]

49.     Real people have already been harmed by inaccurate pulse oximeter readings.[66] Even without medical incident, consumers of wearables with built-in pulse oximeters reasonably feel entitled to financial relief for purchasing and relying on inaccurate devices.[67]

50.     Prior to placing the Fitness Trackers into the stream of commerce and into the hands of consumers to use to measure SpO2 levels, Defendant knew or should have known that the Fitness Trackers would not be able to provide an equal level of accuracy for all users.  Despite the technological disparities based on skin color, the pricing for the Fitness Trackers has remained the same regardless of purchaser.

51.     Defendant misrepresented, omitted, and concealed this stark inaccuracy to consumers, including Plaintiffs and Class members, by not including a disclaimer on the website, packaging, instructions, or otherwise warning of this disparity.

**FED. R. CIV. P. 9(b) ALLEGATIONS**

52.     Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

---

[65] Adam Klasfeld, "Apple Hit with Federal Class Action Lawsuit Alleging 'Racial Bias' in How Watches Measure Blood Oxygen Levels," *Law & Crime*, https://lawandcrime.com/federal-court/apple-hit-with-federal-class-action-lawsuit-alleging-racial-bias-in-how-watches-measure-blood-oxygen-levels/ (December 26, 2022).

[66] Briana Mittleman, "New complaint shows potential trouble for companies selling wearable pulse oximeters," *Stanford Law and Sciences Blog*, https://law.stanford.edu/2023/01/31/new-compliant-shows-potential-trouble-for-companies-selling-wearable-pulse-oximeters/ (January 31, 2023).

[67] *Id.*

53.    **WHO**: Defendant made material omissions of fact in its advertising of the Fitness Trackers by omitting the inherent racial bias in the SpO2 tracking technology.

54.    **WHAT**: Defendant's conduct was and continues to be fraudulent and deceptive because it has the effect of deceiving consumers into believing that the Products are able to provide equally accurate SpO2 readings regardless of skin color.  Defendant omitted from Plaintiffs and Class Members that the Fitness Trackers do not provide SpO2 measurements equally.  Defendant knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions.  Yet, Defendant has omitted from the Fitness Trackers' labeling the fact that they cannot provide the same quality of SpO2 tracking to every purchaser.

55.    **WHEN**: Defendant omitted from the Fitness Trackers' labeling the fact that there is inherent racial bias in the SpO2 tracking technology, continuously throughout the applicable relevant periods, including at the point of sale.

56.    **WHERE**: Defendant's omissions were made throughout its own marketing materials on its website and product pages of secondhand sellers for Defendant's devices and were thus viewed by every purchaser, including Plaintiffs, at the point of sale in every transaction.  The Products are sold in brick-and-mortar stores and online stores nationwide.

57.    **HOW**: Defendant omitted from the Products' labeling the fact that there is inherent racial bias in the SpO2 tracking technology.  And as discussed in detail throughout this Complaint, Plaintiffs and Class Members read and relied on Defendant's omissions before purchasing the Fitness Trackers.

58.    **WHY**: Defendant omitted from the Fitness Trackers' labeling and marketing the fact that the SpO2 tracking technology's accuracy is affected by skin color for the express purpose of inducing Plaintiffs and Class Members to purchase the Products at a substantial price premium or more than they would have paid had they known the truth about the Fitness Trackers.  As such, Defendant profited by selling the Fitness Trackers to at least thousands of consumers throughout the nation, including Plaintiffs and the Class Members.

## CLASS ALLEGATIONS

59.     Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

60.     Plaintiffs seek to represent a class defined as all persons in the United States with dark skin who, between four years prior to the filing of the original Complaint in this action and the date that class notice is disseminated, purchased Fitness Trackers (the "Class").  Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

61.     Plaintiffs also seek to represent a subclass consisting of Class Members who reside in California (the "California Subclass").

62.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class and California Subclass may be expanded or narrowed by amendment or amended complaint.

63.     **Numerosity.**  The Class and California Subclass Members are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of Members in the Class and California Subclass.  Although the precise number of Class and California Subclass Members is unknown to Plaintiffs, it may be easily determined through discovery.

64.     **Commonality.**  Common questions of law and fact exist as to all Members of the Class and California Subclass and predominate over any questions affecting only individual Class or California Subclass Members.  The common legal and factual questions include, but are not limited to, the following:

(a)     Whether Defendant made false and/or misleading statements to the consuming public concerning SpO2 Claims on the Fitness Trackers;

(b)    Whether Defendant omitted material information to the consuming public concerning the actual SpO2 measuring capabilities of the Fitness Trackers;

(c)    Whether Defendant's advertising for the Fitness Trackers is misleading and/or deceptive;

(d)    Whether Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising and sale of the Fitness Trackers;

(e)    Whether Defendant's representations concerning the Fitness Trackers were likely to deceive a reasonable consumer;

(f)    Whether Defendant's omissions concerning the Fitness Trackers were likely to deceive a reasonable consumer;

(g)    Whether Defendant represented to consumers that the Fitness Trackers have characteristics, benefits, or qualities that they do not have;

(h)    Whether Defendant advertised the Fitness Trackers with the intent to sell them not as advertised;

(i)    Whether Defendant falsely advertised the Fitness Trackers;

(j)    Whether Defendant made and breached express and/or implied warranties to Plaintiffs and Class and California Subclass Members about the Fitness Trackers;

(k)    Whether Defendant has been unjustly enriched based on its misrepresentations of the Fitness Trackers;

(l)    Whether Defendant's representations, omissions, and/or breaches caused injury to Plaintiffs and Class and California Subclass Members; and

(m)    Whether Plaintiffs and Class and California Subclass Members are entitled to damages.

65.    **Typicality.**  Plaintiffs' claims are typical of the claims of the other Members of the Class and California Subclass in that, among other things, all Class and California Subclass Members were deceived (or reasonably likely to be deceived) in the same way by Defendant's false and misleading advertising claims about the SpO2 measurement capabilities of the Fitness

Trackers.  All Class and California Subclass Members were comparably injured by Defendant's wrongful conduct as set forth herein.  Further, there are no defenses available to Defendant that are unique to Plaintiffs.

66.    **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the Members of the Class and California Subclass.  Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class and California Subclass.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class or California Subclass.

67.    **Predominance.**  Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual Members of the Class and California Subclass.  The Class and California Subclass issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

68.    **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and California Subclass Members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for Class or California Subclass Members to obtain effective redress on an individual basis for the wrongs committed against them.  Even if Class or California Subclass Members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  It would also increase the delay and expense to all parties and the court system from the issues raised by this action.  The class action device provides the benefits of adjudication of those issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

69.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members

predominate over any questions affecting only individual Members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## COUNT I
### Violation of California's Consumers Legal Remedies Act ("CLRA")
### Cal. Civ. Code §§ 1750, *et seq.*
### (On Behalf Of The California Subclass)

70.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

71.    Plaintiffs bring this claim individually and on behalf of the Members of the proposed California Subclass against Defendant.

72.    Defendant violated California's Consumers Legal Remedies Act (the "CLRA") by engaging in the following unfair and deceptive business practices, as alleged above and herein:

    (a)    Defendant violated Cal. Civ. Code § 1770(a)(5) by representing that the Fitness Trackers have characteristics that they do not have.

    (b)    Defendant violated Cal. Civ. Code § 1770(a)(9) by advertising the Fitness Trackers with the intent not to sell them as advertised.

73.    The CLRA was enacted to protect consumers against such practices.  The CLRA applies to Defendant's conduct because the statute covers all sales of goods to consumers.

74.    Plaintiffs and other Members of the California Subclass are "consumers" within the meaning of Cal. Civ. Code § 1761(d).  By purchasing Defendant's Fitness Trackers, Plaintiffs and other Members of the California Subclass engaged in "transactions" within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

75.    Defendant Fitbit LLC is a "person" within the meaning of Cal. Civ. Code § 1761(c). Defendant's Fitness Trackers are "goods" within the meaning of Cal. Civ. Code § 1761(a).

76.    Defendant's unfair and deceptive business practices, as alleged above and herein, were intended to and did result in the sale of the Fitness Trackers.

77.    As a direct and proximate result of Defendant's unfair and deceptive business practices, as alleged above and herein, Plaintiffs and other Members of the California Subclass suffered injury and damages in an amount to be determined at trial.

78.     On information and belief, Defendant's unfair and deceptive business practices, as alleged above and herein, were willful, wanton, and fraudulent.

79.     On information and belief, Defendant's officers, directors, and/or managing agents authorized the use of the false and misleading statements and material omissions regarding the SpO2 Claims of the Fitness Trackers, as alleged above and herein.

80.     On April 10, 2023, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code §1782(a).  The letter also provided notice of breach of express and implied warranties.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiffs and all other similarly situated purchasers.  Defendant has not responded to the letter.

81.     Plaintiffs and the California Subclass Members seek damages and to enjoin the unlawful acts and practices described herein.

## COUNT II
**Violation of California's Consumers Unfair Competition Law**
**Cal. Bus. & Prof. Code. §§ 17200,** *et seq.*
**(On Behalf Of The California Subclass)**

82.     Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

83.     Plaintiffs bring this claim individually and on behalf of the Members of the proposed California Subclass against Defendant.

84.     Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, by engaging in unfair, fraudulent, and unlawful business practices.

85.     Plaintiffs have standing to pursue this claim because they have suffered an injury-in-fact and have lost money or property as a result of Defendant's unlawful, unfair, and fraudulent conduct.  Specifically, Plaintiffs Foster and Hunter purchased the Fitness Trackers for their own personal use.  In doing so, Plaintiffs relied upon Defendant's false representations that the Fitness Trackers would be able to measure their oxygen saturation levels when that is not true for people

with dark skin.  Plaintiffs spent money in the transactions that they otherwise would not have spent had they known the truth about Defendant's advertising claims.

*"Unfair" Prong of the UCL*

86.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  That unfairness is determined by weighing the reasons, justifications, and motives for the business act or practice against the gravity of the harm to the alleged victims.

87.    Defendant's conduct constitutes an "unfair" business practice because, as alleged herein, Defendant has engaged, and continues to engage, in a false, misleading, and deceptive advertising campaign that misleads consumers into believing that the Fitness Trackers they purchase will work with all skin types, and that they could measure SpO2 levels when that is not true for people with dark skin.

88.    Defendant's conduct, as alleged above and herein, was not motivated by any legitimate business or economic need or rationale, other than to maximize its profits at the expense of consumers with dark skin.  No legitimate reasons, justifications, or motives outweigh the harm and adverse impact of Defendant's conduct on members of the general consuming public. Defendant engaged, and continues to engage, in such conduct solely to wrongfully extract monies from reasonable consumers with dark skin, including Plaintiffs Foster and Hunter, to which Defendant is not entitled.  Defendant could have, but has not, used alternate means of effecting its legitimate business needs, such as by properly disclosing that the Fitness Trackers will not measure SpO2 levels for people with dark skin, by omitting the claim entirely, or discounting the Products to appropriately account for the disparity in functionality.

89.    Defendant's conduct harms consumers and hurts market competition.  Defendant's conduct, as alleged herein, is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Members of the California Subclass because it violates consumers' reasonable expectations.  If Defendant had advertised its Fitness Trackers in a non-misleading fashion, Plaintiffs and other California Subclass Members could have considered other options for purchasing fitness tracking products.

*"Fraudulent" Prong of the UCL*

90.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

91.    Defendant has engaged, and continues to engage, in a "fraudulent" business practice by knowingly representing to consumers that the Fitness Trackers they purchase will equally measure SpO2 levels for people of all skin tones when they do not, and that it can measure SpO2 levels for people with dark skin when that is not true.  Defendant's conduct deceived Plaintiffs and other California Subclass Members who purchased the Fitness Trackers in reliance on the SpO2 Claims, and it is highly likely to deceive members of the consuming public because, as alleged above, it violates consumers' reasonable expectations regarding longevity.  Such a business practice lacks utility and functions only to maximize Defendant's profits at the expense of its customers.  The gravity of the harm to Plaintiffs and other California Subclass Members, who lost money or property by paying for the Fitness Trackers, far outweighs any benefit of Defendant's conduct.

92.    Further, Defendant's fraudulent business practices will continue to mislead consumers because it will be impossible for consumers to know whether Defendant has stopped misrepresenting the functionality of the SpO2 measurement feature of the Fitness Trackers until *after* consumers purchase such products.  Accordingly, the risk of harm to Plaintiffs, Members of the California Subclass, and the consuming public is ongoing.

*"Unlawful" Prong of the UCL*

93.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

94.    Defendant's business practices, as alleged herein, constitute violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA"). Specifically, Defendant has unlawfully marketed and advertised its Fitness Trackers in violation of Cal. Civ. Code §§ 1770(a)(5) and 1770(a)(9), as detailed above.

95.    Defendant's business practices also constitute violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* (the "FAL"), as detailed below.

96.    Defendant's unfair, fraudulent, and unlawful business practices, as enumerated and explained above and below, were the direct and proximate cause of financial injury to Plaintiffs and other Members of the California Subclass.  Defendant has unjustly benefitted as a result of its wrongful conduct.  Accordingly, Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, requiring Defendant to: (a) provide restitution to Plaintiffs and other California Subclass Members; (b) disgorge all revenues obtained as a result of its violations of the UCL; (c) pay attorneys' fees and costs for Plaintiffs and the California Subclass.

**COUNT III**
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code. §§ 17500, *et seq.***
**(On Behalf Of The California Subclass)**

97.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

98.    Plaintiffs bring this claim individually and on behalf of the Members of the proposed California Subclass against Defendant.

99.    Defendant violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 by publicly disseminating false, misleading, and/or unsubstantiated advertisements regarding their Fitness Trackers as alleged above and herein.

100.    Plaintiffs have standing to pursue this claim because they have suffered an injury-in-fact and have lost money or property as a result of Defendant's false advertising.  Specifically, Plaintiffs purchased Fitness Trackers for their own personal use.  In doing so, Plaintiffs relied upon Defendant's false, and misleading representations regarding the Fitness Trackers' SpO2 Claims. Plaintiffs spent money in the transaction that they otherwise would not have spent had they known the truth about Defendant's advertising claims.

101.    Defendant disseminated false and misleading advertisements to increase the sales of their Fitness Trackers.

102.    Defendant knew or should have known that the advertisements for their Fitness Trackers were false and/or misleading.

103.    Defendant knew or should have known that consumers, including Plaintiffs and other Members of the California Subclass, would believe that the Fitness Trackers would be able to provide SpO2 measurements regardless of skin color.

104.    Plaintiffs and Members of the California Subclass have suffered harm as a result of Defendant's violations of the FAL because they paid monies for the Fitness Trackers that they would not have paid but for Defendant's false and misleading advertisements.

105.    Accordingly, Plaintiffs and Members of the California Subclass seek an order of this Court that includes, but is not limited to, requiring Defendant to: (a) provide restitution to Plaintiffs and other California Subclass Members; (b) disgorge all revenues obtained as a result of its violations of the FAL; (c) pay attorneys' fees and costs for Plaintiffs and the California Subclass.

**<u>COUNT IV</u>**
**Breach of Express Warranty**
**(On Behalf of the Class and California Subclass)**

106.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

107.    Plaintiffs bring this claim individually and on behalf of the Members of the proposed Class and California Subclass against Defendant.

108.    As the designer, manufacturer, marketer, distributor, and/or seller of the Fitness Trackers, Defendant issued an express warranty by representing to consumers at the point of purchase that the Fitness Trackers would provide SpO2 measurements, and that this feature works regardless of skin color when that is not true.  Defendant's representations were part of the description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiffs and Members of the Class and California Subclass.

109.    In fact, the Fitness Trackers do not conform to Defendant's SpO2 Claims because the Fitness Trackers cannot provide a SpO2 measurements for those with dark skin.  By falsely representing the Fitness Trackers in this way, Defendant breached express warranties.

110.    As a direct and proximate result of Defendant's breach, Plaintiffs and Members of the Class and California Subclass were injured because they: (1) paid money for Fitness Trackers

that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Fitness Trackers they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Fitness Trackers they purchased had less value than Defendant represented. Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiffs and Class and California Subclass Members would not have purchased the Fitness Trackers or would not have paid as much as they did for them.

**COUNT V**
**Breach of Implied Warranty**
**(On Behalf of the Class and California Subclass)**

111.   Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

112.   Plaintiffs bring this claim individually and on behalf of the Members of the proposed Class and California Subclass against Defendant.

113.   Defendant routinely engages in the manufacture, distribution, and/or sale of Fitness Trackers and are merchants that deal in such goods or otherwise hold themselves out as having knowledge or skill particular to the practices and goods involved.

114.   Plaintiffs and Members of the Class and California Subclass were consumers who purchased Defendant's Fitness Trackers for the ordinary purpose of such products. In the alternative, Defendant marketed the Fitness Trackers, and Plaintiffs and Members of the Class and California Subclass purchased the Fitness Trackers, for the specific purpose of using the SpO2 measurement feature, but received far less solely because of the color of their skin.

115.   By representing that the Fitness Trackers would work uniformly regardless of skin tone, Defendant impliedly warranted to consumers that the Fitness Trackers were merchantable, such that they were of the same average grade, quality, and value as similar goods sold under similar circumstances.

116.   However, the Fitness Trackers were not of the same average grade, quality, and value as similar goods sold under similar circumstances. Thus, they were not merchantable and, as such, would not pass without objection in the trade or industry under the contract description.

117.    As a direct and proximate result of Defendant's breach, Plaintiffs and Members of the Class and California Subclass were injured because they paid money for Fitness Trackers that would not pass without objection in the trade or industry under the contract description.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of the Class and California Subclass)**

118.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

119.    Plaintiffs bring this claim individually and on behalf of the Class and California Subclass.

120.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

121.    Plaintiffs and Class and California Subclass Members conferred benefits on Defendant by purchasing the Fitness Trackers.

122.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and Class and California Subclass Members' purchases of the Fitness Trackers.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Fitness Trackers were not capable of the SpO2 measurement feature as advertised, rendering them unfit for their intended purpose.  Those omissions caused injuries to Plaintiffs and Class Members because they would not have purchased the Fitness Trackers if the true facts were known.

123.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class and California Subclass Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant as follows:

A.      Certifying the Class, and the California Subclass under Rule 23 of the Federal Rules

1   of Civil Procedure and naming Plaintiffs as representatives of the Class and California Subclass

2   and Plaintiffs' attorneys as Class Counsel to represent the Class and California Subclass Members;

3         B.    Declaring that Defendant's conduct violates the statutes referenced herein;

4         C.    Finding in favor of Plaintiffs, the Class, and the California Subclass against

5   Defendant on all counts asserted herein;

6         D.    Ordering Defendant to disgorge and make restitution of all monies Defendant

7   acquired by means of the unlawful practices as set forth herein;

8         E.    Awarding declaratory and injunctive relief as permitted by law or equity, including:

9   enjoining Defendant from continuing the unlawful practices as set forth herein, and directing

10  Defendant to identify, with Court supervision, victims of its conduct and pay them all the money

11  they are required to pay;

12        F.    Awarding Plaintiffs and Class and California Subclass Members their costs and

13  expenses incurred in the action, including reasonable attorneys' fees;

14        G.    Ordering Defendant to pay pre-judgment interest on all amounts awarded;

15        H.    Providing such further relief as may be just and proper.

16  ## JURY TRIAL DEMANDED

17      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and

18  all issues in this action so triable of right.

19

20  Dated:  June 2, 2023          **BURSOR & FISHER, P.A**.

21            By:   */s/ L. Timothy Fisher*
                       L. Timothy Fisher

22
23            L. Timothy Fisher (State Bar No. 191626)
          Jenna L. Gavenman (State Bar No. 348510)

24            Emily A. Horne (State Bar No. 347723)
          1990 North California Blvd., Suite 940

25            Walnut Creek, CA 94596
          Telephone: (925) 300-4455

26            Facsimile:  (925) 407-2700
          E-mail: ltfisher@@bursor.com

27                    jgavenman@bursor.com
                  ehorne@bursor.com

28            *Attorneys for Plaintiffs*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs Bettye Foster and Deborah Hunter in this action. Plaintiff Foster alleges she is a citizen of Oakland, California, Alameda County. Plaintiff Hunter alleges she is a citizen of Suisun City, California, Solano County. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California, this 2nd day of June, 2023.

        */s/ L. Timothy Fisher*
        L. Timothy Fisher